UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

BARBARA S. TAYLOR,

          Plaintiff,

v.                                          Case No.  5:05-cv-153-Oc-10GRJ

JO ANNE B. BARNHART, Commissioner of
the Social Security Administration,

          Defendant.
_____/

## REPORT AND RECOMMENDATION[1]

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for supplemental security income benefits. (Doc. 1.) The Commissioner has answered (Doc. 11) and both parties have filed briefs outlining their respective positions. (Docs. 14 & 20.) For the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY[2]

Plaintiff filed an application for Supplemental Security Income on April 24, 2000, alleging an onset date in 1992.[3] (R. 374-384.)  Her claim was denied initially and upon reconsideration. (R. 358, 361.) On April 15, 2003, following a hearing, Administrative

---

[1] Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation.  Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

[2] Plaintiff had previously filed a claim for Social Security disability insurance benefits in 1996. (R. 71-73.) Plaintiff's claim was denied initially and upon review. (R. 62-65.) The ALJ in that case, R. Neely Owen, issued an unfavorable decision on October 30, 1998 (R. 40-48) and the Appeals Council denied review.  (R. 33-34.)

[3] At her hearing, Plaintiff changed her alleged onset date from 1992, to April 28, 2000. (R. 719.)

Law Judge Philemina M. Jones (the "ALJ") issued a decision unfavorable to Plaintiff. (R. 16-23.) Plaintiff's request for review of that decision was denied by the Appeals Council on December 22, 2004, rendering the ALJ's decision the final decision of the Commissioner. (R. 6.) On March 25, 2005, Plaintiff filed the instant appeal to this Court of the Commissioner's final decision.

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[4] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[5]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[6] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[7] However, the district court will reverse the Commissioner's decision on plenary review if the decision

---

[4] *See* 42 U.S.C. § 405(g).

[5] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[6] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[7] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[8]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[9] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[10]

The ALJ must follow five steps in evaluating a claim of disability.[11] First, if a claimant is working at a substantial gainful activity, she is not disabled.[12] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[13] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[14] Fourth, if a claimant's impairments do not prevent her from doing past

---

[8] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[9] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2003) (All further references to 20 C.F.R. will be to the 2003 version unless otherwise specified.).

[10] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[11] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[12] 20 C.F.R. § 404.1520(b).

[13] 20 C.F.R. § 404.1520(c).

[14] 20 C.F.R. § 404.1520(d).

relevant work, she is not disabled.[15] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[16]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[17] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[18] The Commissioner may satisfy this burden by pointing to the Grids for a conclusive determination that a claimant is disabled or not disabled.[19]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[20] In a situation where both exertional and non-exertional impairments are

---

[15] 20 C.F.R. § 404.1520(e).

[16] 20 C.F.R. § 404.1520(f).

[17] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). *See also* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[18] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[19] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[20] Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996). *See* Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

4

found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[21]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[22] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[23] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

### III. SUMMARY OF THE RECORD

**A. Personal Background**

At the time of the hearing Plaintiff was forty-six years old and had completed high school through the ninth grade. (R. 720.) In the past fifteen years, Plaintiff's work experience consisted of employment with only one company, Carlton Manufacturing. Plaintiff worked at Carlton from 1986-1987 manufacturing chairs. (R. 721-722.) This job required her to spend all day standing, two hours walking, and three sitting, with constant bending. She also lifted objects of fifty to seventy-five pounds frequently and up to 100 pounds. (R. 82-83, R. 385-386.)

---

[21] Walker, 826 F.2d at 1003.

[22] Wolfe, 86 F.3d at 1077-78.

[23] See id.

**B. Plaintiff's Heart Condition[24]**

Plaintiff claims disability due to a heart condition which causes pain in her chest and arms and burning and itching in her feet. (R. 74-75, 88.) Plaintiff had a heart attack in 1992 (R.132) and at that time was diagnosed with ischemic cardiomyopathy with inferior wall akinesis. (R. 237.) Upon admission to the hospital following her heart attack, Plaintiff was treated with Heparin to reduce blockage in the right coronary artery, but also had a bypass performed of the lower abdominal aorta with the placing of an aortobifemoral bi-iliac graft. (R. 153, 183, 198, 211-213, 244-248.) In 1994, after a heart catheterization, the notes of Dr. Frank Hildner disclose that Plaintiff had made satisfactory progress in recovery after this initial bypass without any occlusive lesions to account for Plaintiff's complaints of chest pain. (R. 180, 264.)

In September of 1995, Plaintiff was diagnosed with moderately severe ostial stenosis of the left main coronary artery, mild right coronary artery disease, and mild left anterior descending (LAD) disease. (R. 262.) At that time, 50-60% stenosis was found in her left main artery and 20% in her right coronary artery. (R.132.) Dr. Paul Urban recommended bypass surgery. (R. 260.) In 1995, Plaintiff underwent a double bypass surgery. (R. 99, 260.) The left internal mammary artery was used to bypass the LAD and the left main coronary artery and a segment of the saphenous vein from Plaintiff's left leg was used to bypass the circumflex coronary artery. (R. 139, 259.)

---

[24] Plaintiff's heart condition is most relevant to the subject of this appeal. However, Plaintiff also suffers from diabetes, chronic obstructive pulmonary disease, high cholesterol, and sleeplessness. (R. 94, 95, 97, 104, 101, 110, 346.) Plaintiff takes Nitroglycerin and Norvase for her heart and chest pains, Coumindan as a blood thinner, Glyburide for her diabetes, Methocarbanol for back pain, Zocor for high cholesterol, and Hydroxyzine for sleeplessness. (R. 381, 725)

In 1996, Plaintiff complained of daily chest discomfort which was usually brought on by stress or tiredness. Medication sometimes helped, but it took between ten to twenty minutes to relieve the pain. (R. 89.) To investigate these complaints, Dr. Urban performed a cardiac catheterization. (R. 75, 118.) The results of that revealed 70% stenosis in the left main coronary artery, significant left main disease, mild right coronary artery disease, but normal functioning of the left internal mammary artery graft to the LAD, vein graft to the circumflex marginal, and aortobifemoral graft. (R.118-119, 310.)

While testing by Dr. Dresen over the course of Plaintiff's treatment revealed abnormal results tending toward a diagnosis of ischemia heart disease (R. 121-22, 149, 169), Dr. Urban noted that Plaintiff's grafts continued to remain patent and properly functioning after the bypass surgeries. (R. 255, 281, 322.) Furthermore, Dr. Dresen's clinical notes from 1992-1996 demonstrate that while Plaintiff complained of bilateral arm pain after a stress test, she no longer experienced constant chest pain, pressure, tightness, or unusual shortness of breath after the bypass surgery was performed in 1995. (R. 291-292, 295.) Plaintiff did complain of some chest discomfort when she exercised or was tired. (R. 291.)

In 1997, Dr. Dresen performed a gated myocardial perfusion spect/adenosine scan and noted normal results with evidence of ischemia or prior infarction. The test revealed normal left ventricular systolic function in all segments and normal ejection. (R. 288.) In December of 1997, the results of another heart catheterization showed that

there was stenosis but that all grafts were functioning properly.[25] ( R.322, 340.) In June of 1997, a carotid ultrasound study revealed normal results. (R. 485.) Plaintiff underwent an angioplasty in 1998. (R. 434.)

On August 25, 2000, Plaintiff's physician, Amelia Levy, recommended that a stress test not be performed but recommended another catheterization if Plaintiff continued to exhibit signs of discomfort.[26] (R. 555.) On October 23, 2000, Plaintiff was admitted to Ocala Regional Medical Center with chest pain. It was noted that Nitroglycerin sometimes helped, but the pain was worse on the days she went to the hospital. (R. 446.) Laboratory tests, an EKG, and chest x-rays were all normal. (R. 447-48.) Plaintiff was assessed with acute chest pain, and then checked herself out of the hospital. (R. 448.) She was readmitted a week later on October 31, 2000 for chest pain, nausea, and shortness of breath. Her chest pain subsided by the time she was examined. (R. 434.) Dr. Bush diagnosed her with acute chest pain, and Dr. Dieguez admitted Plaintiff to a telemetry bed to rule out unstable angina. Plaintiff had no chest pain at that time. (R. 439.) Dr. Das analyzed the results of an echocardiogram

---

[25] However, this testing revealed that the aortobifemoral bypass graft was patent but there was a suggestion of partial occlusion of the distal portion of the graft and the left iliac limb. Plaintiff then had a femofemoral bypass performed on the blockage on her left leg. At that time, Plaintiff was told she had a blockage in her right leg and each foot. (R.109, R. 305, 325, 341, 467-483. ) Plaintiff continued to have trouble with her feet and legs. (R. 397, 416-17.) Throughout the record, Plaintiff's feet were noted to be cyanotic in color, cold to touch, with occasional edema, and decreased pulse as a result of peripheral arterial disease. (R. 418, 420, 594-95.)

[26] In July of 2001, certified physician's assistant Robert L. Bullinger, supervised by Robert G. Panzer, D.O., also noted that a treadmill exercise test would be contraindicated given Plaintiff's previous myocardial infarction and medical history. He recommended a stress thallium test. Nevertheless, on October 11, 2000, the Disability Determinations Department sent Plaintiff for a treadmill stress test. Dr. Koka stopped the test after two minutes and three seconds because Plaintiff experienced leg pain. (R. 617.) It was noted that rests relieves her leg pain. (R. 618.) She experienced no chest pain or shortness of breath during that time, but the results were not valid for any subsequent diagnosis because they covered such a short interval of time.

performed on November 1, 2000. He found mild concentric left ventricular hypertrophy with fair left ventriuclar systolic function and ejection fraction at 50%. But there were no definite segmental wall motion abnormalities, nor significant valvular stenosis. There was trace mitral regurgitation and mild tricuspid regurgitation and Doppler evidence of mildly decreased diastolic compliance.  (R. 432.)

On November 2, 2000, Dr. Urban performed another heart catheterization on Plaintiff. It revealed that Plaintiff has coronary artery disease with severe stenosis, but all grafts were patent and allowed the heart vessels to fill well. He noted that while she appears to have severe chronic cardiac and peripheral atherosclerosis, there were no changes to account for ischemic-type symptomatology. He recommended continuing to treat her medically.  (R. 424.)

In Dr. Dresen's clinical notes from October 1, 2002, he noted that he was happy with Plaintiff's medical health and that she has had no chest pain, pressure or tightness. At that appointment, Plaintiff complained of atypical stabbing chest pain that only lasts for an instant. Dr. Dresen assured Plaintiff that this was not from her heart or coronary artery disease. (R. 697.) In August of 2002, Dr. Dresen performed another adenosine study which revealed a very small basal inferior infarct, no ischemia, a left ventricular ejection fraction of 54% and anterior breast attenuation. (R. 701.)

## C. Objective Evidence of Physical Limitations

Dr. Medero performed a consultative evaluation of Plaintiff on July 14, 2000. He noted that Plaintiff's gait was normal and she walked unaided. He found she had no complications due to diabetes, no clinical signs of chronic heart failure, but noted her complaints of daily chest pain and shortness of breath with diaphoretic changes upon

exacerbation. He recommended that a cardiologist perform a treadmill test of Plaintiff. No other abnormalities were found. (R. 420.)

Robert L. Bullinger, a certified physician's assistant supervised by Robert G. Panzer, D.O., completed a joint evaluation in July of 2001. (R. 594-595.) He noted that Plaintiff had full range of motion and flexion in all major joints. Her gait was normal and she used no assistive devices. (R. 594.) She experienced some back pain and pain in her hips and lower extremities when going through the range-of-motion examination of her joints. However, she described this pain as a burning sensation and general discomfort rather than joint pain. The examiner found no signs of respiratory impairment and her grip strength and fine manipulation were normal. There were no significant motor deficits in the extremities and no reproducible fatigue. (R. 595.)

The most recent RFC assessment in the record was completed by Dr. Brigety in August of 2001.[27] At that time, he noted that Plaintiff could occasionally lift ten pounds, frequently lift less than ten pounds, stand and/or walk for only two hours in an eight hour workday, sit for about six hours in an eight hour workday and had occasional limitations on her ability to use her lower extremities. He noted Plaintiff could only assume the various postural positions (climbing, balancing, stooping, kneeling, crouching, and crawling) occasionally. (R. 640.) He also noted she should avoid concentrated exposure to fumes or hazards. (R. 642.) Dr. Brigety explained that he based his assessment on the fact that her symptoms were attributed to second degree generalized atherosclerosis

---

[27] The record also contained an RFC assessment from 1996 completed by Dr. Brigety (R. 273-276) and an RFC assessment completed by another agency physician in 1997. (R. 297-304.)There was also an RFC assessment from 2000 completed by Dr. Holden. Each successive assessment placed additional restrictions on Plaintiff's physical capabilities given her medical condition, but no assessment found severe limitations on her activities of daily living or ability to work at the sedentary level.

and that the severity of her symptoms was consistent with the evidence in the file. (R. 643.) He also noted that the combination of her impairments gave her the capacity to perform sedentary work.[28] (R. 645.)

**D. <u>Testimonial and Subjective Evidence from Plaintiff of Physical Limitations</u>**

Plaintiff testified that she does not need assistance walking, but does not walk very far, perhaps only to the mailbox and back. (R. 731.) She testified that she gets chest pains daily and takes Nitroglycerine, but does not get any relief. Activity causes the chest pains, fatigue, and pain and numbness in her feet and legs which decreases when she sits and subsides when she lies down. (R. 727, 90-91, 94, 97, 376, 398-400, 401, 593, 730.) She testified that she could stand for up to thirty minutes, but it depends upon the day. (R. 720, 732.) Plaintiff claims not to have any grip strength and that she cannot lift more than a gallon of milk. (R. 732.) She claims that she can raise her arms overhead, can bend at the waist but then has trouble standing upright, and she can climb stairs but does not do so often. (R. 733.)

With regard to her daily activities, Plaintiff testified that she can take care of her personal hygiene and prepares three meals a day, often cooking food in the microwave. Her daughter helps her with grocery shopping, laundry, and cleaning the house and her nephew takes care of the yard. (R. 726-729, 733.) Her day consists of getting up, doing a few things around the house, and watching television. Plaintiff testified that she has become moody and as a result does not visit or socialize with others often. (R. 727.)

---

[28] The ALJ called Dr. Summit, a vocational expert ("VE"), to testify at Plaintiff's hearing. He testified that Plaintiff's previous work fell under the DOT job description of assembler which required light physical demands. (R. 735.) The ALJ posed a hypothetical to the VE based on the most recent agency RFC assessment. The VE concluded that Plaintiff could not perform her past relevant work but could perform a limited range of sedentary work. (R. 736, 740.) The testimony of the VE is not in dispute on appeal.

She sees her treating physician Dr. Dresen about every three months, although at the time of the hearing she was scheduled to see him again in six weeks. (R. 734.)

## IV. **DISCUSSION**

The only issue Plaintiff raises on this appeal is whether the ALJ erred as a matter of law by finding that Plaintiff did not meet the Listing for Ischemic Heart Disease. Although Plaintiff submitted a hearing statement to the ALJ in which she "acknowledged that she does not have a listed impairment,"[29] Plaintiff now argues that she meets the criteria for Listing 4.04(C).

Listing 4.04(C) has two parts. To meet this Listing a Plaintiff must provide evidence that she meets the requirements of both parts. In order to satisfy the requirements of listing 4.04, for ischemic heart disease, a claimant must establish, *inter alia,* that he or she has:

> [s]ymptoms due to myocardial ischemia . . . while on a regimen of prescribed treatment . . . with one of the following:
>
> *       *       *       *       *
>
> C. Coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation) or other appropriate medically acceptable imaging, and in the absence of a timely exercise tolerance test or a timely normal drug-induced stress test, an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise tolerance testing would present a significant risk to the individual with both 1 and 2:
>
> 1. Angiographic evidence showing:
>
> a. 50 percent or more narrowing of a nonbypassed left main coronary artery; or

---

[29] R. 705.

      b. 70 percent or more narrowing of another nonbypassed coronary artery; or

      c. 50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or

      d. 50 percent or more narrowing of at least two nonbypassed coronary arteries; or

      e. 70 percent or more narrowing of a bypass graft vessel; and

      2. Resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.

Plaintiff alleges that she meets the percentages for narrowing of the arteries because in the most recent heart catheterization report in the record, dated November 2, 2000, it was found that Plaintiff had a 95% narrowing of the left main coronary artery and 80% blockage of the significant circumflex artery. Notably, however, both the left main coronary artery and the circumflex artery previously were bypassed through surgical procedures. In 1995, Plaintiff underwent a procedure to bypass her left main coronary artery and the circumflex artery. An aortobifemoral graft was placed in a previous procedure. Throughout the record, all grafts were found to be patent. Despite the increase in stenosis in the main arteries, the grafts continued to function properly. Thus, the percentages of stenosis Plaintiff cites as support for her argument that she meets Listing 4.04(C) are irrelevant because these percentages of blockage pertain to arteries that were *bypassed* and do not pertain to arteries that were not bypassed as required by the Listing. Accordingly, for this reason, the evidence does not support Plaintiff's argument that she has satisfied the first criteria for Ischmeic Heart Disease.

Although the Court need not consider the second criteria because Plaintiff cannot establish the first criteria, Plaintiff, nonetheless, also cannot satisfy the second criteria

because the substantial evidence does not establish that she suffers serious limitations in the ability to initiate, sustain, or complete activities of daily living. The evidence of record establishes that Plaintiff was able to cook and care for herself and drive herself to her doctor's appointments. (R. 720.) Plaintiff occasionally was able to go grocery shopping, athough she needed help with cleaning her home and taking care of the yard.

Furthermore, none of her doctors placed any physical limitations upon Plaintiff's abilities. In her most recent visit to Dr. Dresen - her treating physician - he noted that Plaintiff's complaints of chest pain were not related to her heart condition. Robert L. Bullinger, P.A.-C, supervised by Dr. Panzer, noted that Plaintiff had full range of motion of all major joints and Bullinger and Dr. Medero both noted that Plaintiff could walk unassisted and walk with a normal gait. The most recent Residual Functional Capacity Assessment limited Plaintiff to sedentary work with some limitation on use of her lower extremities for pushing and pulling, but the agency physician did not note any severe limitations. Plaintiff's complaints of serious limitations were not supported by the substantial evidence in the record.

For these reasons, the Court concludes that Plaintiff has failed to demonstrate that she meets either of the two prongs of Listing 4.04(C) for Ischemic Heart Disease and, accordingly, the ALJ's decision is due to be affirmed.

## V. RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** in Ocala, Florida, on July 18, 2006.

GARY R. JONES
United States Magistrate Judge

Copies to:
    The Honorable Wm. Terrell Hodges
    Senior United States District Judge

    Counsel of Record